IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| THERESIA KING, Individually and on behalf of all others similarly situated, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )    Civil Action No. _____ |
| INTERSTATE BLOOD BANK, INC., | )<br>)<br>) |
| Defendant. | ) |

**COLLECTIVE ACTION COMPLAINT FOR FLSA VIOLATIONS**

## I.    NATURE OF THE CASE

1. Plaintiff Theresia King, on behalf of herself and others similarly situated to her, brings this complaint against Defendant for failure to pay overtime compensation, in violation of the Fair Labor Standards Act [29 U.S.C. § 201 *et seq*. ("FLSA")]. She also brings, on behalf of herself, a claim against Defendant for unlawful retaliatory discharge in violation of the FLSA.

## II.    JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331, because this case involves federal questions based on a federal statute (the FLSA).

3. Venue in the Eastern District of Tennessee is appropriate pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Knox County, Tennessee, within this judicial district.

## III. PARTIES

4. Plaintiff Theresia King ("Plaintiff" or "Ms. King"), is a resident of Knox County, Tennessee. During the time relevant to this Complaint, Ms. King was employed by Defendant Interstate Blood Bank, Inc.

5. Defendant Interstate Blood Bank, Inc. ("Defendant" or "IBBI"), is a Tennessee corporation. Defendant operates 10 whole blood centers, 23 plasma centers, and a laboratory throughout the United States and collects and supplies human blood and blood components. Defendant operates Knoxville Plasma, a plasma center in Knoxville, Knox County, Tennessee, where Plaintiff King worked.

6. As registered with the Tennessee Secretary of State, Defendant's principal address is 5125 Elmore Road, Suite 6, Memphis, TN 38134-5622. Its registered agent for service of process is CT Corporation System, at 300 Montvue Road, Knoxville, TN 37919-5546.

7. At all relevant times, Defendant IBBI was an "employer," as that term is defined by the FLSA, 29 U.S.C. §203(d), and Ms. King was an "employee" of Defendant as defined by the FLSA, 29 U.S.C. §203(e).

8. Defendant is and, at all times hereinafter mentioned, was an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §203(s)(1)(A) in that said enterprise had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce, and in that said enterprise has annual sales of not less than $500,000.

9. Plaintiff brings this action on behalf of herself and other similarly situated employees as authorized under 29 U.S.C. § 216(b), with respect to her Cause of Action Count 1. Plaintiff's written consent form is attached to the Complaint as Exhibit A.

## IV. FACTUAL ALLEGATIONS

10. Plaintiff King began working for Defendant IBBI at the Knoxville Plasma location on or around July 18, 2013.

11. At the time of hiring Ms. King, Defendant told her she would become a Training Coordinator. This required, however, that she first train and work as a "floater" in different positions at Knoxville Plasma. After spending over a year as a floater, Ms. King was given the title and position of Training Coordinator in January 2015.

12. Ms. King worked exclusively in the position of Training Coordinator from January 2015 until May 2017. As a Training Coordinator, Ms. King's job duties included training all new hires on the company's Standard Operating Procedures (SOPs); conducting training audits and assessments on employees; and conducting re-training for employees as needed due to errors and accidents, changes in the company's SOPs, or company-announced variances from the SOPs. Ms. King also implemented annual trainings for all staff. All the trainings that Ms. King performed or implemented were developed by IBBI's corporate managers, and she followed the training procedures, protocol, and curriculum as required by IBBI.

13. As Training Coordinator, Ms. King did not customarily or regularly direct the work of two or more other employees. She did not have the authority to hire or fire employees or to make suggestions or recommendations that are given particular weight with regard to hiring, firing,

3

or changing the status of other employees. The primary duties of a Training Coordinator do not involve the management of the company.

14. Ms. King's primary duties as Training Coordinator did not include the exercise of discretion and independent judgment with respect to matters of significance. On the contrary, she carried out specific tasks as required of her by her supervisors and IBBI's corporate office.

15. The entire time that Ms. King worked exclusively as Training Coordinator, from 2015 until May 2017, IBBI paid her an hourly wage, including overtime wages at 1.5 times her normal hourly rate for any work done in excess of 40 hours per workweek. The entire time that Ms. King worked for IBBI before being appointed Training Coordinator, from July 2013 until early 2015, IBBI paid Ms. King an hourly wage, including overtime wages at 1.5 times her normal hourly rate.

16. In May 2017, Ms. King was given a new position as a Quality Assurance (QA) Coordinator in the Knoxville Plasma location. Ms. King was told that she would continue to do some Training Coordinator duties, assisting the one other Training Coordinator at that location, until a permanent replacement for her was hired.

17. Ms. King's duties as QA Coordinator primarily involved reviewing and auditing the plasma center's practices to ensure that the center was operating in compliance with SOPs and other corporate policies and mandates. Ms. King's daily duties included such tasks as conducting morning "rounds" to check whether the center was properly staffed, that equipment was properly set up, that appropriate temperatures were maintained, that necessary supplies were stocked, and that log sheets were in place; running reports and/or reviewing reports that were run by managers of the center to ensure that all paperwork was prepared in compliance with SOPs and other company directives; and reviewing and/or preparing additional paperwork to ensure compliance

with SOPs and company directives. Other weekly or monthly tasks that QA Coordinators perform include such things as assessing equipment and storage conditions, reviewing the shipment process to make sure all policies were properly followed, and completing additional paperwork.

18. As QA Coordinator, Ms. King did not customarily or regularly direct the work of two or more other employees. She did not have the authority to hire or fire employees or to make suggestions or recommendations that are given particular weight regarding hiring, firing, or changing the status of other employees. The primary duties of a QA Coordinator do not involve the management of the company.

19. Ms. King's primary duties as QA Coordinator did not include the exercise of discretion and independent judgment with respect to matters of significance. On the contrary, she carried out specific tasks as required by her supervisors and IBBI's corporate office. Her job was to assess whether corporate-mandated policies were being followed.

20. As QA Coordinator, Ms. King did not have authority to formulate or interpret the SOPs or other company polices. She made sure policies were executed as she was instructed by the corporate office. She did not have the authority to waive or deviate from any policies. She did not have the authority to discipline or penalize employees if they did not comply with corporate policies; instead, she reported any errors or deviations she found to her supervisors.

21. Defendant employs at least two QA Coordinators at each of its plasma centers in the nation. Upon information and belief, each whole blood center also employs QA Coordinators. The QA Coordinator job duties were approximately the same for each QA Coordinator.

22. From May 2017 until the end of 2017, during the first few months that Ms. King worked as a QA Coordinator, she and the one other QA Coordinator at Knoxville Plasma were

paid an hourly wage for all hours worked and were paid overtime wages at 1.5 times their normal hourly rate for any hours they officially reported that were in excess of 40 hours per workweek.

23. In order to complete their job duties, Ms. King and the other QA Coordinator routinely worked overtime hours. On numerous occasions in 2017, Knoxville Plasma's Center Manager, Candice Thompson, complained to Ms. King and the other QA Coordinator that they were "working too much overtime" and that the corporate office was unhappy about this. Ms. King and the other QA Coordinator often worked "off the clock" so they could complete their job duties without upsetting their supervisors, and their supervisors were aware of this.

24. At the end of 2017, Ms. Thompson informed Ms. King and the other QA Coordinator that, effective 2018, they would become "salaried" employees. While their base annual salaries were increased, they were told that they would no longer receive overtime wages for hours worked in excess of 40 hours per week. The reason given to them for this change was because they were working too much overtime.

25. The job duties of Ms. King and the other QA Coordinator did not change between 2017 and 2018, despite their classification being changed from "hourly" to "salaried."

26. At the time that Ms. King and the other QA Coordinator became "salaried" employees, their supervisor, the Regional QA Manager, was paid hourly and still received overtime wages. She was switched to "salaried" pay sometime thereafter.

27. In addition to Ms. King and the other "salaried" QA Coordinator, Knoxville Plasma employed two other full-time QA Coordinators for short durations at different times in 2018 and 2019. These other two QA Coordinators were classified as "hourly" employees and were eligible to receive overtime pay. The "hourly" QA Coordinators had the same QA job duties as the

"salaried" QA Coordinators. All were supervised by the Regional QA Manager, as well as the Center Manager.

28. In addition to her QA Coordinator job duties, Ms. King continued to perform Training Coordinator job duties. During the entire time that Ms. King worked at Knoxville Plasma, the center never hired another permanent "backup" Training Coordinator to take Ms. King's place. Therefore, she continued to perform Training Coordinator duties to assist the other Training Coordinator. From May 2017 until the end of her employment in October 2019, Ms. King spent an average of approximately 25 percent of her work time performing Training Coordinator duties.

29. The other Training Coordinator who worked throughout the time that Ms. King worked at Knoxville Plasma continued to be paid on an hourly basis and was eligible to receive overtime wages for working more than 40 hours in a workweek. This Training Coordinator did not generally work overtime hours, however. Instead, Ms. King, who was considered "salaried" beginning in 2018, often was expected to come into work early and stay late to complete both her QA and Training Coordinator duties, and she was not paid any overtime wages for doing so.

30. Both Ms. King and the other "salaried" QA Coordinator at Knoxville Plasma regularly worked more than 40 hours per week after they were changed to "salaried" employees and did not receive overtime wages. Defendant was aware they worked these long hours, as they often complained to their Center Manager and the Regional QA Manager about how long it was taking for them to accomplish their required tasks and that they were concerned that this would affect the quality of their work Ms. King, in particular, complained that she was not getting paid for all the work she was doing. She regularly worked 10 to 12-hour shifts, sometimes up to five times per week and occasionally on weekends.

31.     On a Friday in August 2018, Ms. King's workload was so much that she needed to work at least 14 hours that day and come in on Saturday to complete her work. Both the other QA Coordinator and the other Training Coordinator were on leave that day, so Ms. King had to perform all QA and all Training duties. Defendant had recently announced an SOP variance that it expected the center to implement the next day, requiring Ms. King to train all employees on the new policy right away.

32.     On that day in August 2018, after first complaining in person to Ms. Thompson, Ms. King sent an e-mail to the Regional Quality Assurance Manager, Angie Long. In that e-mail, Ms. King complained that she had more work than could possibly be completed in one day, that she was having to routinely work several extra hours to complete her workload, and that she was required to stay late without extra compensation to do the work of the Training Coordinator. She also expressed concern about the quality of her work in light of the time she had to complete it. Ms. King sent this e-mail to Ms. Long on the recommendation of the Center Manager Ms. Thompson.

33.     On the following Monday, Ms. Long requested to meet with Ms. King. She expressed that she was upset about Ms. King's e-mail and had forwarded it to Ginger Manie, the Regional QA Director who worked in Defendant's corporate office in Memphis. Ms. Long told Ms. King that Ms. Manie was "furious" about the e-mail and that Ms. Long had to talk Ms. Manie out of taking action against Ms. King.

34.     After August 2018, Ms. King continued to work on Training Coordinator duties in addition to QA duties and continued to work overtime hours in order to accomplish her job duties. In 2019, Ms. Thompson decided to train two employees as Training Coordinator, in the hopes of hiring one of them permanently to take the position still being performed by Ms. King. However,

Defendant ultimately decided not to hire either as Training Coordinator, which resulted in Ms. King still having to work two job positions.

35. After August 2018, the other "salaried" QA Coordinator at Knoxville Plasma, who did not have Training Coordinator duties, also continued to routinely work overtime hours.

36. Like all other employees of IBBI, Ms. King used a payroll app set up by IBBI that showed a list of all employees and whether they were classified as "hourly" or "salaried." Ms. King observed through this app that some of IBBI's QA Coordinators around the country were classified as "hourly" and some as "salaried." Upon information and belief, "salaried" employees are not paid overtime.

37. Upon information and belief, although the full-time Training Coordinators at Knoxville Plasma have been classified as "hourly" employees, Defendant classifies some of its Training Coordinators in other centers as "salaried" and does not pay them overtime.

38. The FLSA requires covered employers, such as Defendant, to compensate non-exempt employees at a rate of not less than 1.5 times their regular rate of pay for work performed in excess of 40 hours per workweek.

39. The primary job duties of QA Coordinators employed by Defendant are such that they should be paid overtime wages for all hours worked over 40 in a workweek.

40. The primary job duties of Training Coordinators employed by Defendant are such that they should be paid overtime wages for all hours worked over 40 in a workweek.

41. During the applicable statutory period, Ms. King's primary job duties while working for Defendant, which included both QA Coordinator and Training Coordinator duties, were such that she should have been paid overtime wages for all hours worked over 40 in a workweek.

42. Upon information and belief, Defendant has a common policy or plan of classifying its employees, and particularly its QA Coordinators and Training Coordinators, as "salaried" or "hourly" depending on whether they regularly work overtime and without regard to whether their job duties actually qualify them as exempt from overtime compensation. As a result, several IBBI employees who should be paid overtime are not being paid in compliance with the FLSA.

43. In September 2019, Defendant scheduled its Regional Quality Assessment and Development Specialist, Marlene Downey-Waterstradt, to conduct an evaluation on Ms. King. This was Ms. King's first formal evaluation by the corporate office.

44. Ms. King's Center Manager and Regional QA Manager, both of whom work from the Knoxville Plasma center with Ms. King on a daily basis, had never counseled Ms. King about any performance-related concerns. At the time of Ms. King's evaluation, she had been working as QA Coordinator for over two years. Defendant had previously selected her as qualified to conduct year-end corporate audits and had once chosen her to go to another of its plasma centers to temporarily fill in for a QA Coordinator.

45. In her evaluation of Ms. King, however, Ms. Downey-Waterstradt indicated several areas of concern. One of those areas of concern had to do with alleged mistakes in Ms. King's personal QA training planner, in which she recorded the trainings that she completed throughout the year. Ms. King kept the planner for her use only, to assist her in making sure she completed all required trainings, and she did not use it as proof that her trainings had been done. Defendant maintains separate records that show what trainings have been completed by each employee and on which dates.

46. Ms. Downey-Waterstradt unnecessarily characterized the errors on Ms. King's planner as "falsification," which was an exaggeration of what was, at worst, an inadvertent and

irrelevant error. Ms. Downey-Waterstradt also conducted Ms. King's evaluation in other ways that were less favorable as compared to how the other QA Coordinator at Knoxville Plasma had been evaluated, and she held Ms. King to unfair performance standards. For example, Ms. Downey-Waterstadt criticized Ms. King for not equally sharing the QA workload with the other QA Coordinator, disregarding the fact that Ms. King also was expected to perform Training Coordinator duties on a daily basis, which made it impossible for her to equally share the QA workload.

47. Before Ms. Downey-Watershadt completed her three-day evaluation, she called Ms. Manie to report her evaluation findings. Ms. Downey-Watershadt and Ms. Manie decided to end the evaluation early. Soon thereafter, Ms. Manie, Ms. Downey-Watershadt, and Ms. Long had a conference call about Ms. King's evaluation. Upon information and belief, Ms. Manie referenced Ms. King's prior overtime complaint in discussing what actions Defendant should take regarding Ms. King.

48. On October 11, 2019, Center Manager Candice Thompson called Ms. King into her office and told her that she had received an e-mail from Ginger Manie the night before instructing her to fire Ms. King. The reason given by Ms. Manie for Ms. King's discharge was "falsification of records." Ms. Thompson said she had tried to convince Ms. Manie not to fire Ms. King, but to no avail. Ms. King has never falsified any records and the reason given for her termination is a pretext for retaliation in response to her overtime complaints.

49. Defendant would not have discharged Ms. King but for her prior complaints related to her work hours and not receiving adequate compensation for her hours worked.

## V.   CAUSES OF ACTION

**Count 1: Collective Action Claim: Failure to Pay Overtime in Violation of FLSA**

50.   Plaintiff re-alleges and incorporates herein the preceding paragraphs.

51.   Plaintiff files this action on behalf of herself and all similarly situated individuals. The proposed FLSA Putative Collective is defined as follows:

> All employees of IBBI who worked as Quality Assurance Coordinators and/or Training Coordinators and/or performed similar tasks (regardless of job title) for Defendant and were classified as exempt from overtime wages at any time within the three years prior to the filing of this Complaint.

52.   Plaintiff King has consented in writing to be a part of this action pursuant to 29 U.S.C. § 216(b). *See Exhibit A*. As this case proceeds, it is likely that other individuals will file consent forms and join as "opt-in" plaintiffs.

53.   During the applicable statutory period, Plaintiff King and the Putative Collective routinely worked in excess of 40 hours per workweek without receiving proper overtime compensation for their overtime hours worked.

54.   Defendant is liable under the FLSA for failing to properly compensate Plaintiff and the Putative Collective in violation of 29 USC §207(a).

55.   Defendant's violations against Plaintiff King and the Putative Collective were willful within the meaning of 29 U.S.C. §255(a), as Defendant knew or showed reckless disregard for the fact that its compensation practices with respect to Plaintiff and the Putative Collective were in violation of federal law.

56.   Because of Defendant's unlawful practices, Plaintiff King and the Putative Collective suffered and continue to suffer wage loss and are therefore entitled to recover unpaid

overtime wages for up to three years prior to the filing of their claims, liquidated damages, prejudgment interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

57. Accordingly, notice should be sent to all similarly situated Quality Assurance Coordinators and Training Coordinators, or those who worked in both positions, or those with other job titles who performed the duties of Quality Assurance Coordinators or Training Coordinators. There are numerous employees and/or former employees of Defendant who have suffered from Defendant's practice of denying overtime pay and who would benefit from the issuance of court-authorized notice of this lawsuit and the opportunity to join. Those similarly situated employees are known to Defendant and are readily identifiable through its records.

**Count 2: Plaintiff's Individual Claim: Unlawful Retaliation in Violation of FLSA**

58. Plaintiff re-alleges and incorporates herein the preceding paragraphs.

59. Defendant discriminated against Plaintiff King by retaliating against her and discharging her because of her exercise of her rights under the FLSA, in violation of 29 U.S.C. §218c.

60. Defendant's discrimination and unlawful actions against Plaintiff King were carried out willfully, intentionally, maliciously, and/or with reckless indifference to her rights under the law.

61. Because of Defendant's actions, Plaintiff King is entitled to recover from Defendant the value of her lost wages, benefits, and other economic damages; future lost wages, benefits, and other future economic damages; compensation for non-economic injuries including emotional distress, mental anguish, humiliation, and other pain and suffering; punitive damages;

13

Case 3:20-cv-00113-JRG-HBG   Document 1   Filed 03/17/20   Page 13 of 15   PageID #: 13

interest; attorneys' fees and costs; and other legal and equitable relief that the Court deems just and proper.

### V.  Prayer for Relief

60. Plaintiff King requests that the Court grant the following relief:

    a.  Designation of this action as a collective action on behalf of Plaintiff and those similarly situated and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all those similarly situated apprising them of the pendency of this action and permitting them to assert timely FLSA claims in this action by filing individual consent forms pursuant to 29 U.S.C. §216(b);

    b.  Judgment that Plaintiff and those similarly situated are non-exempt employees entitled to the protection of the FLSA;

    c.  Judgment against Defendant for violation of the overtime provisions of the FLSA;

    d.  Judgment that Defendant's violations as described above were willful;

    e.  An award of unpaid back wages to Plaintiff and those similarly situated at the applicable overtime rate;

    f.  An award of liquidated damages to Plaintiff and those similarly situated and for civil penalties where provided by law;

    g.  An award to Plaintiff of back pay, front pay, and other economic damages caused by Defendant's unlawful termination of her employment;

    h.  An award to Plaintiff of compensatory and punitive damages caused by Defendant's unlawful termination of her employment;

i. An award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216 and/or other applicable laws;

j. An award of prejudgment interest and post-judgment interest as provided by law;

k. Leave to add additional plaintiffs by motion, the filing of written consent forms, or any other method approved by the Court; and

j. For such other and further relief, in law or equity, as this Court may deem appropriate and just.

61. Plaintiff requests a jury trial in this cause.

Respectfully submitted this 17th day of March, 2020:

*s/ Maha Ayesh*

Maha M. Ayesh, BPR #025244
Jennifer B. Morton, BPR #015585

JENNIFER MORTON LAW, PLLC
8217 Pickens Gap Road
Knoxville, TN 37920
(865) 579 0708
(865) 579-0787 (fax)
jen@jmortonlaw.com
maha@jmortonlaw.com

*Attorneys for Theresia King and the Putative Collective*